**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: May 24, 2024.**

**MICHAEL M. PARKER**
**UNITED STATES BANKRUPTCY JUDGE**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| FORTUNATO CARRAMAN, JR. & | § | |
| GUADALUPE V. CARRAMAN, | § | CASE NO. 22-51009-MMP |
| | § | |
| | § | |
| DEBTORS. | § | CHAPTER 13 |
| | § | |
| | § | |
| MARY K. VIEGELAHN, | § | |
| CHAPTER 13 TRUSTEE, | § | |
| | § | |
| PLAINTIFF, | § | |
| | § | |
| V. | § | ADVERSARY NO. 23-05045-MMP |
| | § | |
| TITLEMAX OF TEXAS, INC., | § | |
| | § | |
| DEFENDANT. | | |

1

## OPINION

### I.  INTRODUCTION

Before the Court are cross-motions for summary judgment: Plaintiff's *Amended Motion for Entry of Summary Judgment Pursuant to Fed.R. Bankr.P. 7056* ("**Trustee's Motion**," ECF No. 23)[1] and *TitleMax of Texas, Inc.'s Motion for Summary Judgment* ("**TitleMax's Motion**," ECF No. 26). Both parties seek to determine the validity of a security interest held by TitleMax of Texas, Inc. ("**TitleMax**") on the Debtors' vehicle.

### II.  JURISDICTION

The Court has jurisdiction under 28 U.S.C. § 1334, and the Standing Order of Reference of the United States District Court for the Western District of Texas, dated October 4, 2013. This is a core proceeding under 28 U.S.C. § 157(b)(2)(K). Venue is proper under 28 U.S.C. § 1409. Plaintiff has consented to the entry of final orders and a judgment by this Court in this adversary proceeding. (ECF No. 12). Defendant's Answer (ECF No. 16) contains consent to the Court's entry of final judgments, subject only to Defendant's denied jurisdictional claims in its Motion to Dismiss (ECF Nos. 5 and 14).[2]

### III.  BACKGROUND

The basic facts are uncontested, even though the parties characterize the same facts differently. The Debtors entered into a Loan Agreement, Promissory Note and Security Agreement with TitleMax (collectively, "**First Loan**"). The First Loan lent the Debtors $5,571.00 at an interest rate of 176.06% per year, with TitleMax retaining a security interest in the Debtors'

---

[1] "ECF" denotes the electronic filing number.
[2] To the extent both parties have not consented to this Court's entry of a final judgment, this Opinion represents the Court's findings of fact and conclusions of law, which are subject to de novo review.

vehicle. The Documents did not contain a "future advance" or "dragnet" clause.[3] Less than a month later the Debtors entered into yet another set of financing documents ("**Second Documents**") with TitleMax (collectively, "**Second Loan**"). This time, TitleMax advanced $9,988.00 at an interest rate of 181.55% annually. The Second Loan satisfied the First Loan and increased Debtors' obligations to TitleMax by an additional $4,417 over the balance of the First Loan. On September 7, the Debtors filed bankruptcy in the Western District of Texas (Case No. 22-51009, the "**Main Case**"). Main Case, ECF No. 1. The next day, the Texas Department of Motor Vehicles issued a certificate of title covering the Chevrolet Traverse, which identified TitleMax as a lienholder and identified the "lien date" as August 2, 2022 (reflecting the date of the First Loan). After it advanced funds for the Second Loan, TitleMax never filed the Second Documents with the Texas Department of Motor Vehicles seeking to obtain a new lien notation on the Chevrolet Traverse certificate of title, which would have again identified TitleMax as a lienholder, but would have also identified a *new* lien date, corresponding to the Second Loan date.

Both parties move for summary judgment. The Trustee asserts TitleMax's failure to record its Second Loan security interest on the Chevrolet Traverse certificate of title renders TitleMax unperfected, and that the Trustee may avoid the security interest created by the Second Loan under § 544.[4] The Trustee asserts the security interest created by the First Loan was extinguished when TitleMax funded the Second Loan and used part of the Second Loan proceeds to satisfy and extinguish the First Loan and its security interest.

---

[3] A "future advance" or "dragnet" clause allows a creditor's existing, perfected security agreement to secure a creditor's future advances of funds to a debtor, without requiring such creditor to re-perfect its security interest in those future advances.

[4] Unless otherwise noted, all statutory references are to Title 11 of the United States Code.

TitleMax contends that there was no need to perfect the Second Loan, because the Second Loan merely "extended and renewed" or "refinanced" the First Loan, and that the security interest created on the Chevrolet Traverse certificate of title remains in effect as originally perfected. TitleMax also argues that because the Debtors' confirmed chapter 13 Plan[5] listed TitleMax as a "secured creditor," res judicata prevents the Trustee from challenging its secured status. Finally, TitleMax argues that because the Trustee allowed the Debtors to remove the car from the bankruptcy estate via exemption, this security interest avoidance action is not "for the benefit of the estate," and therefore the Trustee lacks the standing necessary to bring this claim.

## IV.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Both parties concede that there is no genuine issue of material fact, and instead each argue that they are entitled to judgment as a matter of law based on the law of perfection. If the Trustee can show that TitleMax's security interest was unperfected at the time of the bankruptcy filing, and if the Trustee has standing to avoid the security interest, the Trustee is then entitled to judgment as a matter of law. If TitleMax, however, can show that its Second Loan was merely an extension and renewal of its First Loan,[6] such that TitleMax did not need to record the Second Loan security interest on the Chevrolet Traverse's certificate of title[7] to maintain a perfected security interest

---

[5] Main Case, ECF Nos. 2 and 23.

[6] TitleMax also alleges that if it can show the Second Loan was merely a "refinance" of the First Loan, it is entitled to judgment as a matter of law but, as explained below, the Court does not agree with that conclusion if the "refinance" satisfied the First Loan.

[7] All that would change on the certificate of title would be the date of the security interest (from the First Loan date to the Second Loan date), as the secured party would remain the same.

4

(created by the First Loan security agreement), or show that the Trustee lacks standing to bring this claim, it is entitled to judgment as a matter of law.

**V.    DISCUSSION**

**a.  TITLEMAX'S SECURITY INTEREST IS UNPERFECTED AND AVOIDABLE**

TitleMax contends that the Second Loan was an "extension and renewal" of the First Loan, or that the Second Loan was a "refinance" of the First Loan. In either case, TitleMax contends, the First Loan was (i) properly perfected and (ii) never satisfied, such that there was no need to re-perfect the security interest. TitleMax argues that a holding to the contrary would put "form over substance," essentially forcing it to re-record its security interest just to change the security interest date on the certificate of title.

The Trustee counters that the Second Loan was neither an extension and renewal nor a refinance, as TitleMax appears to define this term, of the First Loan. Instead, the Trustee argues, the Second Loan was a new loan, greater in amount than the balance of the First Loan when it was made, which completely paid off or satisfied the First Loan, extinguishing the First Loan's security interest. The Second Loan was thus a new, separate loan, requiring separate perfection to obtain perfected secured status. The Trustee *also* argues that a holding to the contrary would put "form over substance," disregarding the actual nature of the Second Loan in favor of TitleMax's assertions that it was an extension and renewal of the First Loan.

**i.  THE SECOND LOAN SATISFIED THE FIRST LOAN**

The parties characterize the Second Loan differently, knowing that such characterization drives the determination of whether TitleMax needed to perfect the Second Loan security interest. Setting aside the labels placed on the Second Loan transaction, a key factor driving the

5

characterization of the Second Loan is whether proceeds from the Second Loan *satisfied* the First

Loan. If the Second Loan satisfied the First Loan, the First Loan and its security interest were

extinguished, requiring TitleMax to independently perfect the Second Loan's security interest. If

the First Loan security interest survived, it may also serve to secure the Second Loan's security

interest.

Security agreements may contain a "future advances clause," under which a lender's

security interest in the collateral secures not only the original loan, but also later advances of

money to a borrower. LAW AND PRACTICE OF SECURED TRANSACTIONS § 2.05. A lender's interest

in collateral covered by a future advances clause will automatically perfect when it makes a future

advance. *Id*. The parties here concede that the Security Agreement has no explicit future advances

clause. TitleMax's Motion at 8.

The Security Agreement does, however, contain the following section, which will be the

starting point for understanding the mechanics of the Second Loan:

> "Lender may agree to refinance this Loan in its sole discretion. If [Credit
> Services Organization ("**CSO**")][8] agrees to help me *refinance* my loan from
> Lender, I must enter into a new CSO Contract with CSO and pay an additional
> CSO Fee to CSO for its services provided to me in connection with *refinancing*
> the Loan. As a condition to any *refinance*, I must pay to Lender the minimum
> *refinance* payment amount, satisfy the Lender's other underwriting criteria for
> *refinances* and enter into a new *Loan Agreement, Promissory Note and Security
> Agreement with Lender*."

ECF No. 24 at 7 (emphasis added) ("**New Document Provision**").

This language contemplates that the Second Loan would require new documentation,

including a new security agreement. An advantage of a future advances clause is to obviate the

---

[8] A credit services organization, or CSO, is defined under the Texas Finance Code as an entity that (i) helps improve
a consumer's credit history or rating, (ii) extends consumer credit to a borrower, or (iii) gives advice or assistance
regarding (i) or (ii). Tex. Fin. Code § 393.001(3).

need for new security documents whenever additional funds are advanced by a lender. Bruce A. Campbell, *Contracts Jurisprudence and Article Nine of the Uniform Commercial Code: The Allowable Scope of Future Advance and All Obligations Clauses in Commercial Security Agreements*, 37 HASTINGS L.J. 1007, 1008 (1986). TitleMax relies on the provision above to support its assertions that the Second Loan was either a "renewal and extension" or a "refinance," which, even with no future advances clause, would allow TitleMax to rely on its original perfected security interest to secure later advances like the Second Loan. The Court interprets this provision differently.

TitleMax first argues the Second Loan *renewed and extended* the First Loan.[9] In a renewal and extension, a lender grants a borrower more time to perform its obligations under a loan in exchange for fees or additional conditions to the loan. ***Inwood Nat'l Bank v. Wells Fargo Bank, N.A.***, 463 S.W.3d 228, 238 (Tex. App.—Dallas 2015, no pet.). The original loan "survives" the renewal and extension (rather than being satisfied and replaced by a new loan). ***Id***. Although its security agreement nominally allows for "renewals," TitleMax's characterization of the Second Loan as a renewal and extension is unconvincing. Renewals and extensions do not typically involve the advancement of additional funds to the borrower. ***Id***. They simply allow a borrower more time to comply with its performance obligations. ***Id.*** Here, the Second Loan involved the advance of an *additional* $4,417 to the Debtors (over the First Loan amount), so it was not a renewal and extension of the First Loan.

---

[9] TitleMax's Security Agreement allows the Debtor to request a loan *renewal* through the CSO. The Court cannot find any reference to a loan *extension* in the TitleMax Security Agreement or Loan Agreement.

TitleMax also argues that the Second Loan was a *refinance* of the First Loan, which would allow TitleMax to use the perfection of its First Loan to also perfect its Second Loan.[10] Texas courts looking to define "refinance" have considered, if not deferred to, the definition of "refinance" under federal regulations. *See, e.g.*, **Sims v. Carrington Mortg. Servs., L.L.C.,** 440 S.W.3d 10, 13 (Tex. 2014) (considering the Federal Reserve Board's definition of a refinance in distinguishing a refinance and a mortgage modification). Accordingly, the Court will turn to a relevant definition of "refinance" under federal regulations.

Regulation Z of the Truth in Lending Act ("**TILA**"), which applies to closed-end consumer credit transactions, states that a "refinancing occurs when an existing obligation that was subject to this subpart is *satisfied and replaced by a new obligation undertaken by the same consumer*. A refinancing is a new transaction requiring new disclosures to the consumer."[11] 12 C.F.R § 1026.20(a) (2024) (emphasis added). The official comments to the TILA definition add that a "refinancing may involve the consolidation of several existing obligations, *disbursement of new money to the consumer* or on the consumer's behalf, or the rescheduling of payments under an existing obligation." *Id.* (emphasis added). In any event, a refinance must involve, and is characterized by, the satisfaction and replacement of an existing debt. *Id.*

Under the TILA definition, if the Second Loan satisfied and replaced the First Loan, then TitleMax's label of the Second Loan as a "refinance" is correct, but may not help TitleMax. The

---

[10] Neither party defines "refinance" in their pleadings, but both argue that defining the loan as a refinance favors their position. The New Document Provision uses the term "refinance" four times.

[11] TILA provides for five exceptions to this definition, none of which apply to the loans here. These are: (1) a renewal of a single payment obligation with no change in the original terms, (2) a reduction in the annual percentage rate with a corresponding change in the payment schedule, (3) an agreement involving a court proceeding, (4) a change in collateral requirements or payment schedule in response to the borrower's default or delinquency *unless* the interest rate is increased or the amount financed exceeds the unpaid balance, and (5) the renewal of optional insurance bought by the borrower and added to an existing transaction. 12 C.F.R § 1026.20(a)(1-5).

key question is not whether the Second Loan was a "refinance," but whether the First Loan was satisfied. If so, the Second Loan was an advance of new money that required the protection of a newly perfected security interest.

Here, the Second Loan satisfied the First Loan. TitleMax never disbursed the face amount of the Second Loan to the Debtors. Instead, TitleMax used the Second Loan proceeds to pay themselves what was still owed on the First Loan, satisfying it, and then releasing the remaining funds to the Debtors, who continued making loan payments to TitleMax (at a higher interest rate).[12]

The Court therefore holds that the Second Loan satisfied the First Loan, extinguishing it and its security interest, requiring TitleMax, absent a future advances clause in its security agreement, to perfect the security interest it obtained when advancing the Second Loan. As a new loan, the Second Loan imposed greater procedural requirements upon TitleMax, requiring new loan documents, a new security agreement, and new perfection.

In short, TitleMax needed to re-perfect its interest upon making the Second Loan unless the Second Loan was a future advance covered by an effective future advances clause. As the Court explains below, the Second Loan was a future advance but was not covered by a future advances clause.

### ii. TITLEMAX'S SECURITY AGREEMENT HAS NO FUTURE ADVANCES CLAUSE

The parties do not contest that there is no explicit future advances clause in either of TitleMax's loan agreements with the Debtors. Without such a clause (whether explicit or implied), any future advances TitleMax made to the Debtors would not automatically perfect. Thus, if the

---

[12] The Second Loan's documents showed that the proceeds of the Second Loan were applied to the balance of the First Loan before the remainder was released to the Debtor. TitleMax's Motion, Ex. C. Thus, the Debtor was not making two separate loan payments each month (one for the First Loan and another for the Second Loan) to TitleMax.

Second Loan was a future advance made without a future advances clause, TitleMax's interest is unperfected.

The Trustee argues that the lack of future advances clause dooms the Second Loan's perfection because the Second Loan satisfied and extinguished the First Loan, thereby eliminating its security interest. Thus, TitleMax's entire claim is unperfected. TitleMax counters that a future advances clause is implied, or unnecessary, to perfect the Second Loan. Both TitleMax and the Trustee rely on *Guiles v. RBFCU (In re Guiles)*, 580 B.R. 466 (Bankr. W.D. Tex. 2017).

In *Guiles*, the debtor took out a loan secured by her car. *Id*. at 469. Sometime later, the debtor took out a second loan from the same lender, part of which satisfied the balance of the first loan. *Id*. The trustee sued to avoid the lender's security interest on the car using § 544(a)(1), arguing that  the lender's failure to record its security interest for the second loan, rendered the entire claim unperfected.[13] *Id*. Judge Gargotta held that the cross-collateralization clause in the lender's security agreement operated as an enforceable future advances clause, and that the second loan was a future advance within the scope of that clause. *Id*. at 473. Thus, there was no need for the lender to re-perfect its security interest. While Judge Gargotta relied heavily on the existence of a future advances clause in the security agreement in *Guiles*, the security agreement here has no future advances clause or cross collateralization clause, and TitleMax identifies no such clause. Does this change the result?

It does. The question at the heart of *Guiles* was whether the future advances clause in that security agreement extended to perfect a second advance after satisfaction of an initial loan. *Id*. at

---

[13] The Trustee may step into the shoes of a hypothetical judicial lien creditor and avoid a security interest that is unperfected as of the commencement of a bankruptcy case. Tex. Bus. & Comm. Code Ann. § 9.317(a)(2) (West 2023). *Tarbox v. Soris (In re Biggerstaff)*, 2004 Bankr. LEXIS 837 (Bankr. N.D. Tex. 2004) (citing, e.g., *Mitchell Coach Mfr. Co. v. Stephens*, 19 F. Supp. 2d 1227, 1235-36 (N.D. Okla. 1998) (applying Texas law)).

472. That the Trustee in *Guiles* did not contest the existence of a cross collateralization clause or that it could serve as a future advances clause in the security agreement is critical—the analysis relies on the principle that "full payment of a loan does not satisfy the debtor's obligation *if a future advance clause properly covers other existing loans.*" *Id*. (citing *In re Conte*, 206 F.3d 536 (5th. Cir. 2000)) (emphasis added). Thus, *Guiles* focused on whether satisfaction (via a future advance) of an initial loan extinguished a security interest created by a security agreement containing a valid, uncontested future advances clause. *Guiles* relies heavily upon the assumption that the parties were operating under a future advances clause. Without any future advances clause, *Guiles* is distinguishable.

The facts here establish that the Second Loan was a future advance and the language TitleMax cites does not substitute for a future advances clause. Thus, the lack of future advances clause renders TitleMax's security interest unperfected and avoidable under § 544.

### 1.  NO FUTURE ADVANCES CLAUSE WAS IMPLIED

TitleMax argues the lack of a future advances clause in the security agreement is not fatal because a future advances clause is implied under the parties' agreement. TitleMax does not cite the record or law that provides how a court can imply a future advances clause in a security agreement, but does refer to two cases which suggest certain language in a security agreement, specifically cross collateralization language, may serve as a future advances clause. *Community Credit Union v. Conte (In re Conte)*, 206 F.3d 536, 537 (5th Cir. 2000); *Guiles*, 580 B.R. at 471.

11

The security agreement in ***Conte*** contained this cross-collateralization clause, which was held to be a future advance clause:

> "The security interest […] also secures any other loans you have with the credit union now *or in the future* and any other amounts you owe the credit union for any reason now *or in the future.*" ***Id.*** at 537 (emphasis added).

The security agreement in ***Guiles*** contained a similar clause:

> "You are giving this Interest to secure repayment of your loan as well as any other amount you now owe *or will owe the Credit Union in the future*. The collateral also secures your performance of all other obligations under your loan, this security agreement, and any other agreement you have with the Credit Union." ***Guiles***, 580 B.R. at 471 (emphasis added).

The provisions in ***Conte*** and ***Guiles*** contained clear language indicating that the security interest in the collateral would continue to secure future advances. The Court can find no language in TitleMax's security agreement, including the New Document Provision, that implies future advances will be secured by the security interest created by the First Loan's security agreement. Moreover, TitleMax's security agreement for the First Loan provides that the Second Loan would require a new security agreement. By definition, a future advances clause contemplates the use of an *existing* security agreement to secure future advances. Campbell, *supra* at 1008.

 While the language of TitleMax's security agreement does appear to contemplate a potential future advance, TitleMax cites no language in the security agreement suggesting such future advance will be secured by the existing security agreement. ***Conte***, 206 F.3d 536, 538 (5th Cir. 2000) (citing ***Kimbell Foods, Inc. v. Republic Nat'l Bank of Dallas***, 557 F.2d 491, 495 (5th Cir. 1977)) (The language of the security agreement determines whether the parties intended for future advances, and the test is an objective one).

12

The Court can find no reason to imply a future advances clause based on the language of the New Document Provision. So even though the parties contemplated that TitleMax might make a Second Loan to the Debtors, the security agreement does not appear to contemplate a way to secure future advances either in name (TitleMax calls the transaction a "refinance" or a "renewal and extension") or substance (each transaction requires a new security agreement, unlike an extension and renewal of a promissory note secured by an existing security agreement). The New Document Provision does not "clearly and unequivocally" represent the intention of the parties that the original security agreement and collateral should secure future advances, and so the Court declines to treat it as a future advances clause. *Kimbell Foods*, 557 F.2d at 496.

## 2. THE SECOND LOAN WAS A FUTURE ADVANCE

Having found that the security agreement had no future advances clause, either explicit or implied, the Court now turns to whether the Second Loan was a future advance. The Bankruptcy Code does not define "future advance," although it may be simply described as a separate extension of value by a creditor to the debtor made after the original security agreement. Campbell, *supra* at 1008. Under this definition, the Second Loan was a future advance: a separate extension of value by TitleMax, made after, and functionally separate from, the First Loan. *Id*.

TitleMax did not structure the transaction in a way to allow automatic perfection of future advances.[14] Without a valid future advances clause, TitleMax's security interest did not automatically perfect when it made the Second Loan.

---

[14] TitleMax benefitted from the future advance by changing the loan terms (specifically, increasing the interest rate) between the First Loan and Second Loan.

### iii. TITLEMAX WAS SEPARATELY REQUIRED UNDER TCOTA TO RE-PERFECT ITS SECURITY INTEREST BY RE-TITLING

#### 1. CLARK CONTRACTING DOES NOT APPLY

TitleMax also argues that failure to re-title a vehicle to change the security interest date on the certificate of title is not required for perfection, relying on ***Wells Fargo Equip, Fin. v. Rodriguez (In re Clark Contr. Servs.)***, 438 B.R. 913 (W.D. Tex. 2010). In ***Clark Contracting***, the District Court for the Western District of Texas reversed the Bankruptcy Court's order holding that a creditor's failure to re-title vehicles bought from the prior security interest holder rendered those security interests unperfected. ***Clark Contracting***, 438 B.R. at 925. In so deciding, the District Court held that *re-titling upon assignment* of a security interest under § 501.114 of the Texas Certificate of Title Act ("**TCOTA**") is permissive, not mandatory. Section 501.114(a) of TCOTA was amended in response to the Bankruptcy Court's decision in ***Clark Contracting*** to state:

> "A lienholder may assign a lien recorded under Section 501.113 without making any filing or giving any notice under this chapter. The lien assigned remains valid and perfected and retains its priority, securing the obligation assigned to the assignee, against transferees from and creditors of the debtor, including lien creditors…"

TCOTA § 501.114(a) (2011) (amending TCOTA § 501.114 (2009)).

The Court does not find ***Clark Contracting*** applicable here. First, § 501.113 of TCOTA covers the recordation of security interests obtained by *any* means, not just assignment. Yet the Texas Legislature opted to amend *only* § 501.114(a) to specify that re-titling need not maintain perfection upon *assignment*. Because § 501.114(a) is intentionally narrower than its predicate provision, § 501.113, it should not be read to extend to security interests obtained by non-assignment means. *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE

14

INTERPRETATION OF LEGAL TEXTS 183 (2012) (expressing the canon of construction that the more specific provision prevails when a general and specific provision conflict).

Second, the nature of the Second Loan is distinct from the assignment in ***Clark Contracting***, where the creditor stepped into the shoes of the prior security interest holder's already-perfected security interest. Here, on the other hand, TitleMax *created a new security interest* when it, by the terms of its own loan agreement, entered into a new security agreement with the Debtor upon issuance of the Second Loan. A transaction that creates a new security interest does not fall within § 501.114(a)'s exception to re-titling. ***In re Moye***, 437 F. App'x 338, 343 (5th Cir. 2011) (holding that a newly created security interest in a vehicle did not automatically perfect under § 501.114(a) because the transaction giving rise to the security interest was not an assignment).

## 2. THE PURPOSE OF THE RE-TITLING REQUIREMENT

TitleMax finally argues that its failure to re-title upon issuing the Second Loan did not change the perfection of its security interest because the only thing that would change on the certificate of title for the car would be the date of the security interest, so creditors would still have notice of its security interest.[15] TitleMax asserts that the small variance in the dates between the First Loan and the Second Loan is insignificant given the logistics of re-titling a car, and requiring perfection via re-titling of the Second Loan under these circumstances would be a "pointless exercise" that would "not serve the notice goals of [Texas'] perfection process." TitleMax's Motion at 9. The Court disagrees.

---

[15] "Functionally, the lien notation would have looked precisely the same—the same collateral and the same creditor information—but for the listed date the lien came into effect." ***Guiles***, 580 B.R. at 468.

15

While the fact that re-titling here would only change the date notation on the car title by a month gave the Court pause, only re-titling serves the notice goals of Texas' perfection process. While notation of a security interest on a title puts potential creditors on inquiry notice of encumbrances on the vehicle, a holding that lenders like TitleMax are not required to re-title upon making a future advance would only confuse and disadvantage other creditors. A new lender relying on a car title with an earlier-dated security interest (and no future advances clause) could advance funds to a debtor, mistakenly thinking such newly advanced funds have priority over any future advance to that debtor by its original title lender. Under TitleMax's view of the law, however, the original title lender (here, TitleMax) may continue to advance funds to that debtor, with each future advance relating back to the date of the original security interest and gaining priority over a new lender's security interest (despite the lack of notice to the new lender that a future advances clause would provide).[16]

To illustrate, suppose a subsequent creditor ("**Second Title Lender**") sought to extend the Debtor credit secured by the same car in which TitleMax claims a perfected security interest. Upon seeing TitleMax's security interest on the car's certificate of title, the Second Title Lender would likely ask about the balance owed to TitleMax to determine whether the Debtor has any equity in the car and investigate TitleMax's security agreement with the Debtor to determine whether it contained a future advances clause. If the Second Title Lender determined that there was sufficient equity in the car and that TitleMax's original loan lacked a future advances clause, the Second

---

[16] The Court acknowledges that, under these facts, a Second Title Lender would have difficulty, in the month between the First Loan and Second Loan, determining the secured status of the Second Loan given that TitleMax still had the car's certificate of title. From a policy perspective, however, the hypothetical judgment lien creditor must operate under hard deadlines, and those deadlines required that TitleMax timely perfect its security interest in a later advance. The Court lacked any evidence that TitleMax even tried to comply with its obligation to retitle the car where no future advances clause existed. In fact, TitleMax believed it had no such obligation.

16

Title Lender could be confident that, if it advanced money to the Debtor, it could obtain a security interest in the Debtor's equity in the car that could not be subordinated by any future advance from TitleMax to the Debtor. Without a later loan perfection date on the certificate of title or a future advances clause, the Second Title Lender *would not* be put on notice that later advances from TitleMax to the Debtor could *decrease* the value of the Second Title Lender's subordinate security interest while allowing TitleMax to retain its priority.[17] To hold that TitleMax did not need to re-perfect by re-titling would upset the Second Title Lender's expectations and improperly award TitleMax by allowing it to leapfrog the Second Title Lender's position in the priority "waterfall," despite TitleMax's failure to include a future advances clause in its security agreement or obtain a notice of its Second Loan security interest on the certificate of title.

TitleMax's reliance on *Guiles* for the proposition that "Texas law avoids mandatory re-titling when no purpose is served" is also misplaced. *Guiles*, 580 B.R. at 474. Perhaps there was no purpose served by re-titling in *Guiles*, in which the court found that the challenged security interest was properly perfected by an effective future advances clause. *Id.* Here, however, re-titling (i) perfects TitleMax's Second Loan security interest, which did not automatically perfect under a future advances clause, and (ii) provides unambiguous notice to potential secondary creditors regarding the priority of any security interest they might take in the car.

Further, in Texas, perfection of a security interest in a vehicle is governed by TCOTA and Article Nine of the Texas Business and Commerce Code ("**Texas Article Nine**"). TCOTA § 501.111 (providing procedures under both TCOTA and Texas Article Nine for

---

[17] That is, advances made after (i) the First Loan date noted on the car title if the security agreement had a future advances clause, or (ii) the Second Loan date noted on the car title if the security agreement did not have a future advances clause, as was the case here.

17

perfecting security interests in vehicles). Thus, while the purposes of TCOTA may diverge from those of Texas Article Nine, TCOTA's treatment of *security interests* is inextricable from Texas Article Nine. Accordingly, the "notice goals of the perfection process" in Texas are not defined solely based on TCOTA, but also based on the purposes of Texas Article Nine.

By validating the perfection of security interests through a future advances clause, Article Nine of the Uniform Commercial Code aimed to both reduce transaction costs and the risks assumed by secured creditors in lending. Campbell, *supra* at 1074. Article Nine's treatment of future advances contemplates the reduction of those risks not only to the primary secured lender, but to any secondary lenders (who run the risk of having their "equity cushion" in the collateral wiped out by snowballing future advances made by the primary lender). *See id.* at 1015-16. The trade-off for the primary secured lender is not too steep—it must simply make clear in its contract that its security interest is protected by a future advances clause. Indeed, while pre-Article Nine courts were "liberal in construing the parties' agreement as including future advances," courts today are highly reluctant to read in a future advances clause when the parties' intent is unclear. *Id*. at 1020; *see, e.g.*, ***Kimbell Foods***, 557 F.2d at 496.

TCOTA adds to this statutory scheme (adopted by Texas) the requirement that a security interest be recorded on a vehicle's title to perfect. TCOTA § 501.111(a). This requirement serves both TCOTA's independent purpose of preventing theft and Texas Article Nine's purposes of notice and risk reduction to creditors. *See* TCOTA § 501.003 (articulating the purposes of TCOTA, which include theft prevention).

18

In short, TCOTA's re-titling requirement is not a "pointless exercise" of changing the date on the car title. TitleMax needed to comply when it made the Second Loan.[18] Thus, the Court holds that TitleMax's failure to re-title after the Second Loan rendered its security interest unperfected.

### b) THE PLAN IS NOT RES JUDICATA AS TO THE TRUSTEE'S CLAIM.

TitleMax argues confirmation of the Debtors' Plan, which treats TitleMax as a secured creditor, precludes (via res judicata) the Trustee's avoidance complaint. § 1327(a) ("[t]he provisions of a confirmed plan bind the debtor and each creditor, whether or not the claim of such creditor is provided for by the plan, and whether or not such creditor has objected to, has accepted, or has rejected the plan."); *Friendly Fin. Service – Eastgate v. Dorsey (In re Dorsey)*, 505 F.3d 395, 398-99 (5th Cir. 2007); Fed. R. Bankr. P. 3015 (after a chapter 13 plan is confirmed, "any determination in the plan made under Rule 3012 about the amount of a secured claim is binding on the holder of the claim, even if the holder files a contrary proof of claim or the debtor schedules that claim, and regardless of whether an objection to the claim has been filed.").

Res judicata may bar a party from bringing a claim where: (1) the parties are identical to that of the prior action (or in privity with the original parties); (2) the prior judgment was rendered by a court of competent jurisdiction; (3) the prior action was concluded by a "final judgment on the merits"; and (4) the same claim is involved in both actions. *United States v. Davenport*, 484 F.3d 321, 326 (5th Cir. 2007). Res judicata and its related doctrine of collateral estoppel "relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." *Allen v. McCurry*, 449 U.S. 90, 94 (1980). Confirmation of a chapter 13 plan under § 1327(a) is treated as "res judicata

---

[18] The cure for TitleMax and similar title lenders is evident—include future advances clauses in security agreements to obtain automatic perfection of security interests in future advances and avoid re-titling issues.

as to all justiciable issues which were or could have been decided at the confirmation hearing." **Sanchez v. Ameriquest Mortg. Co. (In re Sanchez)**, 372 B.R. 289, 307 (Bankr. S.D. Tex. 2007) (citing **In re Brady Municipal Gas Corp.**, 936 F.2d 212, 215 (5th Cir. 1991)). Only those issues ripe for decision at the time of confirmation are binding—parties are not barred from raising post-confirmation objections to claims if they could not have done so at the confirmation hearing. **Sanchez**, 372 B.R. at 307 ("Res judicata cannot bar objections to charges that debtors did not know existed"); *see also* **In re Linkous**, 141 B.R. 890, 898 (W.D. Va. 1992), *aff'd*, 990 F.2d 160 (4th Cir. 1993) ("Issues that were not mature for decision and could not be appropriately resolved in either the confirmation hearing or in the order confirming the plan are not barred."). This exception to the res judicata effect of a confirmed plan logically follows from the general res judicata criteria that the prior judgment be "on the merits" and involve "the same claim." **Davenport**, 484 F.3d at 326.

Here, pre-confirmation the Trustee objected to TitleMax's claim, seeking to avoid TitleMax's security interest ("**Trustee's Objection**").[19] While it was procedurally improper, the Trustee's Objection was pending at the time of confirmation without response from TitleMax.[20] The Court granted the unopposed Trustee's Objection shortly after the confirmation hearing but before entry of the order confirming Debtor's plan.[21] Notwithstanding the Trustee's outstanding challenge to the secured status of TitleMax's claim, the Court accepted the Trustee's recommendation and confirmed the Debtors' plan subject to the Trustee's outstanding objection to the secured status of TitleMax's claim in the Debtors' plan.[22] Before entry of the confirmation

---

[19] Main Case ECF No.13.
[20] Main Case ECF Nos. 13 and 23.
[21] Main Case ECF No. 21.
[22] Main Case ECF No. 2.

order,  the Court granted the Trustee's Objection, which changed TitleMax's claim status to unsecured; as a result, by the time the Court entered the confirmation order, TitleMax's claim had been changed from secured to a general unsecured claim of $11,453.60.[23] Several months later, on TitleMax's motion, the Court vacated on procedural grounds the order granting the Trustee's Objection.[24]

TitleMax argues that because the pre-confirmation objection was later "overruled," the Trustee is now barred from filing this adversary proceeding. TitleMax argues that the post-confirmation vacating of the order finding its claim unsecured imputes to the Trustee knowledge that TitleMax's claim was avoidable pre-confirmation, and as such the Trustee should have sought to avoid TitleMax's lien in a procedurally proper manner pre-confirmation. The Court agrees that the Trustee had preconfirmation notice that TitleMax's security interest was avoidable and had the Trustee not acted on that notice, it might have been bound by res judicata. But the Trustee did act.

At the time of the confirmation hearing, the Trustee (and the Debtors) *had already brought* an action to avoid the security interest and the Court had avoided TitleMax's security interest before the Court entered an order confirming the Debtors' plan. While the Court acknowledges the incongruity between TitleMax's challenged secured status and the Debtors' confirmed plan, the Court cannot retroactively apply res judicata to bar the Trustee from suing post-confirmation where the Trustee had no reason to bring an avoidance adversary pre-confirmation when she had a pending (albeit procedurally defective), uncontested challenge to TitleMax's secured claim status, and obtained an order avoiding TitleMax's security interest pre-confirmation. *See **Roman Cath. Archdiocese of San Juan v. Feliciano***, 140 S. Ct. 696, 700-01 (2020) (holding that courts may

---

[23] Main Case ECF Nos. 21 and 23.
[24] Main Case ECF No. 32.

not enter *nunc pro tunc* orders which seek to retroactively change the past); Main Case ECF No. 21.

TitleMax cites ***Hope v. Acorn Fin. (In re Fluellen)*** as authority holding that a Trustee may not bring a security interest avoidance action post-confirmation if the creditor has already been treated as secured under the plan. ***Fluellen***, 446 B.R. 612 (Bankr. M.D. Ga. 2011). In ***Fluellen***, a lender perfected its security interest in the debtor's vehicle *post-petition*, giving rise to a preference avoidance action. The chapter 13 trustee, however, did not file an adversary proceeding challenging the preference until after the debtor's plan was confirmed. The bankruptcy court, after analyzing many cases in which courts prevented trustees and debtors from pursuing post-confirmation challenges to a secured creditor's status, held similarly that the trustee could not challenge the post-confirmation perfection as a preference. The ***Fluellen*** court, however, limited its ruling to the facts of its case, specifically stating that "the Trustee was fully aware of the avoidable nature of the creditor's security interest before confirmation." ***Id.*** at 619. Indeed, ***Fluellen*** distinguished a case holding that confirmation did not bar an avoidance action where the trustee did not discover untimely perfection until after confirmation. *Id.* at 617 (reviewing ***Hope v. First Fam. Fin. Svcs. of Ga., Inc. (In re Harrison)***, 259 B.R. 794 (Bankr. M.D. Ga. 2000)).

Here, the Trustee's Objection challenged TitleMax's security interest before the confirmation hearing, and, shortly before the confirmation order was entered, the Court granted the Trustee's Objection and avoided TitleMax's security interest (even though that order was later vacated for procedural defects in the Trustee's Objection). The Trustee raised the avoidance issue before the confirmation hearing and successfully obtained an order avoiding TitleMax's security interest before entry of the confirmation order, and so should not be penalized for failing to file an

22

adversary proceeding pre-confirmation. In other words, by the time the confirmation order was entered, TitleMax's security interest had been avoided, so there was nothing left for the Trustee to avoid. The Trustee is thus not barred by res judicata from pursuing this adversary proceeding.

        **c)** **T**HE **T**RUSTEE HAS STANDING TO BRING THE SECURITY INTEREST AVOIDANCE CLAIM.

TitleMax also argues that the Trustee lacks standing to bring this adversary proceeding because (i) there is no "benefit to the estate" and (ii) the action is not to avoid security interests on "property of the estate."

Section 551 provides that any transfer avoided under § 544 "is preserved for the benefit of the estate but only with respect to property of the estate." A trustee may not avoid a transfer where the benefit of such avoidance flows solely to the debtor instead of to the estate. *Whiteford Plastics Co. v. Chase Nat'l Bank*, 179 F.2d 582 (2d Cir. 1950); *Wellman v. Wellman*, 933 F.2d 215, 217-18 (4th Cir. 1991). The Trustee counters that the avoidance would, in fact, benefit the estate in this case. Avoidance of TitleMax's security interest would increase distributions to unsecured creditors or at least expedite equivalent distributions to those creditors. Thus, the estate benefits if the Trustee avoids the security interest.

TitleMax's also asserts that the Trustee may not avoid the security interest on exempted, non-estate collateral. As mentioned above, § 551 preserves avoided transfers "only with respect to the property of the estate." The Debtors' exemptions vested thirty days after the § 341(a) meeting of creditors. § 522(l); Fed. R. Bankr. P. 4003(b); *Taylor v. Freeland & Kronz*, 503 U.S. 638, 643 (1992). TitleMax contends that because the Debtors exempted the car, it is not "property of the estate," so the Trustee may not use § 551 to preserve TitleMax's avoided interest.

Section 541(a) defines "property of the estate" as, among other things, "all legal and equitable interests of the debtor in property *as of the commencement of the case*." § 541(a)(1) (emphasis added); ***United States v. Whiting Pools, Inc.***, 462 U.S. 198, 203-06 (1983). Of course, "property of the estate" is not static: debtors and trustees may *add* to the property of the estate via avoidance actions and turnover motions, and debtors may *subtract* from the property of the estate by claiming exemptions. ***Owen v. Owen***, 500 U.S. 305, 308 (1991) (superseded by statute on other grounds). ("An exemption is an interest withdrawn from the estate (and hence from the creditors) for the benefit of the debtor.") But as ***Owen*** points out, "[n]o property can be exempted (and thereby immunized), however, unless it first falls *within* the bankruptcy estate." *Id*. So the question remains: when an avoidance action is brought under § 544, as it is here, is "property of the estate" what the estate holds at the petition date, or what it holds when the adversary proceeding is brought?

Section 544 gives the trustee the rights and powers of "a creditor that extends credit to the debtor *at the time of the commencement of the case*, and obtains, at such time and with respect to such credit, and execution against the debtor that is returned unsatisfied at such time…" § 544(a)(2) (emphasis added). The trustee's "strong arm" reflects powers as they exist at the petition date, and § 551 automatically preserves those avoided transfers for the benefit of the estate. Whether or not the debtor later exempts property is immaterial for the analysis under § 544 and § 551—property in the estate at the time of filing is "property of the estate" for purposes of § 551.

By contrast, if a chapter 7 trustee sought to avoid a tax lien encumbering exempt property under § 724(a), the trustee could not avoid the lien. *See **United States v. Warfield (In re Tillman)**, 53 F.4th 1160 (9th Cir. 2022) (holding that because § 724(a) and § 726(a)(4) describe property of

24

the estate upon distribution, avoidance under § 724(a) applies only to property that is part of the estate at time of distribution). Avoidance under § 544 considers circumstances as they were on the date of filing bankruptcy, not when the trustee brings the avoidance action itself. Therefore, § 551 does not exclude exempt property from preservation. ***Heintz v. Carey (In re Heintz)***, 198 B.R. 581, 586 (9th Cir. B.A.P. 1996).

To hold otherwise would provide odd incentives: the Trustee would have been forced to object to the Debtor's exemption (likely without merit) only to try to avoid the unperfected security interest. Or it would place the Debtor in a strange situation, deciding between exempting property subject to an otherwise avoidable security interest, or forgoing the exemption to allow the trustee to avoid the security interest. Instead, this Court holds that a trustee has standing to avoid security interests under §§ 544 and 551 on property that the debtor has exempted.

## VI.   <u>CONCLUSION</u>

For all these reasons, the Court will **DENY** TitleMax's Motion for Summary Judgment and **GRANT** the Trustee's Motion for Summary Judgment and enter a separate Judgment consistent with this Opinion.

# # #